**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Deborah Salazar,<br><br>    Plaintiff,<br><br>v.<br><br>Carolyn W. Colvin, Commissioner of Social Security,[1]<br><br>    Defendant. | No. 12-CV-00803-PHX-GMS<br><br>**ORDER** |

Pending before the Court is the appeal of Plaintiff Deborah Salazar, which challenges the Social Security Administration's decision to deny benefits. (Doc. 1.) For the reasons set forth below, the Court affirms the Social Security Administration's decision.

**BACKGROUND**

On May 10, 2006, Salazar applied for disability insurance benefits, alleging a disability onset date of March 29, 2006. (R. at 234.) Salazar's date last insured ("DLI") for disability insurance benefits, and thus the date on or before which she must have been disabled, was December 31, 2010. (*Id.* at 23.) Salazar's claim was denied both initially and upon reconsideration. (*Id.* at 116-17, 134-40, 142-44.) Salazar then appealed to an

---

[1] Carolyn W. Colvin became the Acting Commissioner of the Social Security Administration on February 14, 2013. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure and 42 U.S.C. § 405(g), Carolyn W. Colvin is substituted for Michael J. Astrue as the Defendant in this suit.

1  Administrative Law Judge ("ALJ"). (*Id.* at 145-46.) The ALJ conducted a hearing on the
2  matter on April 21, 2008. (*Id.* at 70-96.)

3  In evaluating whether Salazar was disabled, the ALJ undertook the five-step
4  sequential evaluation for determining disability.[2] (*Id.* at 25-35.) At step one the ALJ
5  determined that Salazar had not engaged in substantial gainful activity since the alleged
6  onset date. (*Id.* at 25.) At step two, the ALJ determined that Salazar suffered from severe
7  impairments including recovery from multiple surgeries, fibromyalgia, headaches,
8  depression, and anxiety. (*Id.*) At step three, the ALJ determined that none of these
9  impairments, either alone or in combination, met or equaled any of the Social Security
10 Administration's listed impairments. (*Id.*)

---

[2] The five-step sequential evaluation of disability is set out in 20 C.F.R. § 404.1520 (governing disability insurance benefits) and 20 C.F.R. § 416.920 (governing supplemental security income). Under the test:

> A claimant must be found disabled if she proves: (1) that she is not presently engaged in a substantial gainful activity[,] (2) that her disability is severe, and (3) that her impairment meets or equals one of the specific impairments described in the regulations. If the impairment does not meet or equal one of the specific impairments described in the regulations, the claimant can still establish a prima facie case of disability by proving at step four that in addition to the first two requirements, she is not able to perform any work that she has done in the past. Once the claimant establishes a prima facie case, the burden of proof shifts to the agency at step five to demonstrate that the claimant can perform a significant number of other jobs in the national economy. This step-five determination is made on the basis of four factors: the claimant's residual functional capacity, age, work experience and education.

*Hoopai v. Astrue*, 499 F.3d 1071, 1074–75 (9th Cir. 2007) (internal citations and quotations omitted).

At that point, the ALJ made a determination of Salazar's residual functional capacity ("RFC"),[3] concluding that Salazar could perform a range of sedentary work. (*Id.* at 27.) The ALJ thus determined at step four that Salazar did not retain the RFC to perform her past relevant work as a child protection services supervisor, therapist, or psychiatric social worker. (*Id.* at 256.) The ALJ therefore reached step five, determining that Salazar could perform a significant number of other jobs in the national economy that met her RFC limitations. (*Id.* at 33-35.) Given this analysis, the ALJ concluded that Salazar was not disabled. (*Id.* at 35.)

On appeal, the Appeals Council remanded the claim to the ALJ for a new hearing. The Council directed the ALJ to give further consideration to Salazar's maximum residual functional capacity with reference to the treating and non-treating source opinion evidence and to obtain supplemental evidence from a vocational expert to clarify the effect of the assessed limitations on Salazar's occupational base. (*Id.* at 131-33.) The ALJ held another hearing on January 4, 2010. (*Id.* at 97-115.) The ALJ once again found that Salazar was not disabled. (*Id.* at 19-41.) The Appeals Council denied Salazar's second request for review. (*Id.* at 1-6.)

Salazar filed the complaint underlying this action on April 17, 2012, seeking this Court's review of the ALJ's denial of benefits.[4] (Doc. 1.) The matter is now fully briefed before this Court. (Docs. 20, 23, 24.)

**DISCUSSION**

**I.    Standard of Review**

A reviewing federal court will address only the issues raised by the claimant in the appeal from the ALJ's decision. *See Lewis v. Apfel*, 236 F.3d 503, 517 n.13 (9th Cir.

---

[3] RFC is the most a claimant can do despite the limitations caused by his impairments. *See* SSR 96-8p (July 2, 1996).

[4] Salazar was authorized to file this action by 42 U.S.C. § 405(g) ("Any individual, after any final decision of the Commissioner of Social Security made after a hearing to which he was a party . . . may obtain a review of such decision by a civil action . . . .").

2001). A federal court may set aside a denial of disability benefits only if that denial is either unsupported by substantial evidence or based on legal error. *Thomas v. Barnhart*, 278 F.3d 947, 954 (9th Cir. 2002). Substantial evidence is "more than a scintilla but less than a preponderance." *Id.* (quotation omitted). "Substantial evidence is relevant evidence which, considering the record as a whole, a reasonable person might accept as adequate to support a conclusion." *Id.* (quotation omitted).

However, the ALJ is responsible for resolving conflicts in testimony, determining credibility, and resolving ambiguities. *See Andrews v. Shalala*, 53 F.3d 1035, 1039 (9th Cir. 1995). "When the evidence before the ALJ is subject to more than one rational interpretation, we must defer to the ALJ's conclusion." *Batson v. Comm'r of Soc. Sec. Admin.*, 359 F.3d 1190, 1198 (9th Cir. 2004). This is so because "[t]he [ALJ] and not the reviewing court must resolve conflicts in evidence, and if the evidence can support either outcome, the court may not substitute its judgment for that of the ALJ." *Matney v. Sullivan*, 981 F.2d 1016, 1019 (9th Cir. 1992) (citations omitted).

## II. Analysis

Salazar argues that the ALJ erred by: (1) rejecting the opinions of Salazar's treating physician and other opinion evidence (Doc. 20 at 5-8), (2) misinterpreting evidence to Salazar's detriment (*id.* at 8-9), and (3) implicitly rejecting Salazar's testimony for being incredible (*id.* at 9). The Court will address each argument in turn.

### A. Rejection of Medical Opinion Evidence

#### 1. Treating Physician's Opinion

"The medical opinion of a claimant's treating physician is entitled to special weight." *Rodriguez v. Bowen*, 876 F.2d 759, 761 (9th Cir. 1989) (internal quotation marks and citation omitted). This is because the treating physician "is employed to cure and has a greater opportunity to know and observe the patient as an individual." *Andrews v. Shalala*, 53 F.3d 1035, 1040–41 (9th Cir. 1995). If, as here, another doctor counters the treating physician's opinion, "the ALJ may not reject this opinion without providing

- 4 -

specific and legitimate reasons supported by substantial evidence in the record." *Orn v. Astrue*, 495 F.3d 625, 632 (9th Cir. 2007) (internal quotation marks and citation omitted). "The ALJ can meet this burden by setting out a detailed and thorough summary of the facts and conflicting clinical evidence, stating his interpretation thereof, and making findings." *Embrey v. Bowen*, 849 F.2d 418, 421 (9th Cir. 1988). "In many cases, a treating source's medical opinion will be entitled to the greatest weight and should be adopted, even if it does not meet the test for controlling weight." *Orn*, 495 F.3d at 632 (citing SSR 96-2p[5] at 4, 61 Fed. Reg. at 34,491). However, "the ALJ need not accept the opinion of any physician, including a treating physician, if that opinion is brief, conclusory, and inadequately supported by clinical findings." *Thomas v. Barnhart*, 278 F.3d 947, 957 (9th Cir. 2002).

Salazar contends that the ALJ gave insufficient weight to the opinion of her treating physician, Dr. Ralph Bennett, on the extent and effects of her impairments. Among the records submitted by Dr. Bennett, the ALJ considered two medical source statements ("MSS") and a Physician's Supplemental Statement ("PSS"). The ALJ accorded "very little weight" to the MSSs for lack of diagnostic support and found that the PSS conflicts with other medical records. (R. at 33.) Thus the ALJ declined to give controlling weight to the treating physician's opinion. (*Id.* at 32.) Because Dr. Bennett's opinion was controverted by the opinion of the state agency physician, Dr. John Spriggs, the ALJ must give specific and legitimate reasons supported by substantial evidence in the record for rejecting Dr. Bennett's opinion. *See Orn,* 495 F.3d at 632; *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1995); *Embrey,* 849 F.2d at 421.

---

[5] Social Security Rulings (SSRs) "do not carry the 'force of law,' but they are binding on ALJs nonetheless." *Bray v. Comm'r Soc. Sec. Admin.,* 554 F.3d 1219, 1224 (9th Cir. 2009). They "'reflect the official interpretation of the [SSA] and are entitled to some deference as long as they are consistent with the Social Security Act and regulations.'" *Id.* (alteration in original) (quoting *Avenetti v. Barnhart,* 456 F.3d 1122, 1124 (9th Cir. 2006)).

In both MSSs dated October 6, 2006 and April 17, 2008, Dr. Bennett endorsed extreme limitation and disability. He completed checklist-style forms that reflected Salazar's limited ability to sit and stand for a total of three hours during an eight-hour work day, and pain and fatigue that would severely limit her ability to function. (*Id.* at 585-87, 777-79.) Dr. Bennett concluded that Salazar would not be able to lift much weight, had limited hand control, could occasionally bend and squat, and had environmental limitations. (*Id.*) His opinion was that Salazar would not be able to perform even sedentary work for extended periods of time.

The ALJ found it to be a "major flaw" that the October 6, 2006 MSS was not supported by objective medical evidence. (*Id.* at 33.) On the MSS, Dr. Bennett marked "yes" to the question "[c]an the above [proffered limitations] be reasonably expected to result from a medically determinable impairment as set forth in the diagnostic impression in your narrative report?" (*Id.* at 587.) But no concurrent narrative report was provided. The ALJ presumed that "Dr. Bennett relied primarily on the subjective reports of [Salazar] in formulating his opinion" and discounted the MSS as a result. (*Id.* at 33.)

There is substantial evidence in the record for the ALJ's conclusion. Dr. Bennett last examined Salazar almost one year before the MSS on October 18, 2005, (id. at 509), and prior to her alleged onset of disability on March 29, 2006. Salazar's last clinical visit was three months prior to the MSS on June 27, 2006. (*Id.* at 505.) That visit was with Carol Swenson, a nurse at Dr. Bennett's clinic, who also authored the clinical notes summarizing the visit. Because Swenson is a nurse practitioner, her opinion is not accorded the same weight as that of a treating physician and the Commissioner. *Gomez v. Chater*, 74 F.3d 967, 970–71 (9th Cir.), *cert denied*, 519 U.S. 881 (1996) (noting that opinions from "other sources" including nurse practitioners may be given less weight than those from "acceptable medical sources"); *see* 20 C.F.R. §§ 404.1513(d), 416.913(d). While Swenson recommended that Salazar's leave from work be extended,

she did not suggest that Salazar would not be able to work again for a period of one year or more. (*Id.* at 505, 506, 508.) Thus, the ALJ had substantial evidence to accord the October 6, 2006 MSS "very little weight."

The ALJ diminished also the weight of Dr. Bennett's April 17, 2008 MSS because it did not "identify any impairment or diagnostic assessment associated with the proffered limitations" and seemed to be based on Salazar's subjective complaints. (R. at 33.) Further, it was noted that the April 17, 2008 MSS was essentially the same document as the October 6, 2006 MSS "without change or modification." (*Id.*) Before the second MSS, Dr. Bennett had last examined Salazar on February 11, 2008. During that visit, Dr. Bennett stated that Salazar had good flexion and extension, and full abduction of the shoulders, good range of motion in the elbows and wrists with no swelling, crepitation or tenderness noted, and a good range of motion in the knees and ankles with no swelling, crepitation or tenderness noted. (*Id.*) He determined that muscle strength was "5/5" in the upper and lower extremities. (*Id.*) That diagnosis casts doubt on the severe limitations proffered in the April 17, 2008 MSS. The ALJ had substantial evidence to give the April 17, 2008 MSS "very little weight."

The ALJ finally considered Dr. Bennett's April 8, 2008 PSS but gave it minimal weight. (R. at 33.) In the PSS, Dr. Bennett concluded that Salazar would not be able to work in any capacity with "reasonable continuity" due to fibromyalgia, neck pain, and knee osteoarthritis. (*Id.* at 780.) He stated that Salazar could not sit for prolonged periods of time, bend, or stoop. Although Dr. Bennett linked his assessment to her conditions, the PSS did not reference diagnostic or clinical findings. (*Id.* at 33.) The ALJ noted an inconsistency between Dr. Bennett's diagnosis of knee osteoarthritis on the PSS and his clinical examination notes which "raises questions concerning the remaining portions of his assessment." (*Id.* at 33)*; see Tommasetti,* 533 F.3d at 1041; *Weetman v. Sullivan,* 877 F.2d 20, 23 (9th Cir.1989) (rejecting a treating physician's opinion because it was

inconsistent with contemporaneous medical notes). Specifically, Dr. Bennett's February 11, 2008 notes stated that Salazar had a good range of motion in the knees and ankles with no swelling, crepitation or tenderness noted. That is a legitimate reason to give the PSS minimal weight. The ALJ did not err in weighing Dr. Bennett's opinion.

### B. Misinterpretation of Evidence to Salazar's Detriment

#### 1. Absenteeism from Surgeries

Salazar contends that the ALJ did not address the impact of rehabilitation after her surgeries on her ability to sustain employment for twelve months. The Social Security Act defines a disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which . . . has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). Salazar had five surgical procedures during a period of sixteen months between June 2008 and October 2009. Specifically, she had surgeries on the following extremities:  left shoulder on June 17, 2008 (R. at 828), left hand on October 2, 2008 (*id.* at 1022), right hand on December 30, 2008 (*id.* at 1016), bilateral thumb trigger finger releases on July 30, 2009 (*id.* at 1005-08), and left knee on October 29, 2009 (*id.* at 1044). Salazar argues that no employer would have hired her for twelve months because the surgeries and periods of convalescence after her surgeries would lead to excessive absenteeism from work. Salazar points to testimony of the vocational expert that if an employee needed to have several surgical procedures over an 18-month period and had to take one month of leave for each surgery, "most employers wouldn't keep a job waiting for . . . that long." (*Id.* at 113.) The ALJ did not discuss the effect of absenteeism on Salazar's ability to sustain work when reviewing her surgical history. (*See id*. at 28-33.) It is possible that her surgeries and rehabilitation would require leave from even sedentary work. However, Salazar does not point to evidence that establishes the potential duration of leave for each surgery and whether physical therapy would have also required her to

take leave. The Court cannot determine whether the cumulative effect of the surgeries would have prevented her from engaging in substantial gainful activity for a period of twelve months or longer. Because Salazar did not carry her burden to provide or even elucidate such evidence, the Court will not remand for such a determination.

### 2. Impairments in Combination

Salazar asserts that the ALJ failed to consider her impairments in combination for a finding of disability. A combination of impairments may result in a finding of disability even where no single impairment taken alone would result in such a finding. 20 C.F.R. § 404.1523. If a claimant has two or more concurrent impairments which, when considered in combination, are severe, the ALJ must also determine whether the combined effect of the claimant's impairments can be expected to continue to be severe for twelve months. *Id.* § 404.1522(b). However, if one or more of the claimant's impairments improves or is expected to improve within twelve months, so that the combined effect of the claimant's remaining impairments is no longer severe, the claimant does not meet the twelve month duration test. *Id.* § 404.1522(b).

The ALJ found that although Salazar's surgeries suggested significant impairment and would normally weigh in her favor, that weight "is offset by the fact the surgeries were generally successful in either resolving or significantly reducing [her] symptoms of pain and limitation." (R. at 27.) The ALJ concluded that Salazar's medical impairments relating to her cervical spine, left shoulder, left knee, and hands "were either resolved or rendered mild as a result of surgery." (*Id.* at 27-28.) For example, on March 29, 2006, Salazar had cervical discectomy and fusion surgery on her spine. On April 7, 2006, Salazar felt the surgery was a success and preoperative pain was largely resolved, vitiating the need for pain medication. Diagnostic findings presented mild impairment of her cervical spine in the following months. (*Id.* at 791, 783.) However, during her last examination, Dr. Jenpin Weng found that Salazar's head and neck were "atraumatic" and

her cervical range of motion was "pain free and within functional limits." (*Id.* at 1031.) After Salazar underwent left shoulder arthroscopy on June 17, 2008, she pursued physical therapy and had frequent follow-up visits. She stated that the shoulder was doing "very well" and back to normal activity by December 1, 2008. (*Id.* at 822.) After Salazar's left knee arthroscopy on October 29, 2009, the ALJ noted that there were no records of further visits with her treating orthopedic surgeon "suggesting that [her] left knee problem was either resolved or significantly improved as a result of surgery." (*Id.* at 29.) On October 2 and December 30 of 2008, Salazar underwent surgery on her left and right hands, respectively. Salazar and her treating sources believed her surgeries were "very successful." (*Id.* at 843.) Finally, after complaining of pain in her thumb joints, Salazar received open thumb trigger finger releases on July 30, 2009. During a follow-up visit on October 21, 2009, her treating source no longer diagnosed her with carpal tunnel syndrome and Salazar no longer complained of hand or wrist pain. (*Id.* at 1040.)

The ALJ considered Salazar's impairments individually and in combination but found the surgeries reduced the impact of those impairments on Salazar's ability to work. (*Id.* at 33.) Substantial evidence supports the finding that the combined effect of Salazar's impairments was no longer severe as a matter of law because they improved or were expected to improve within 12 months. *See* 20 C.F.R. § 404.1522(b); *Magallanes v. Bowen*, 881 F.2d 747, 750 (9th Cir. 1989) (The ALJ's decision to deny benefits will be overturned "only if it is not supported by substantial evidence or is based on legal error.") (internal citation omitted).

### 3. Severity of Fibromyalgia Symptoms

Salazar further contends that the ALJ erred in assessing the severity of her impairments resulting from fibromyalgia. The ALJ found Salazar's fibromyalgia to be a medically determinable severe impairment. (R. at 25, 31.) The Commissioner argues that not all severe impairments are disabling and the ALJ had to determine the limitations

- 10 -

caused by the impairment. On October 18, 2005, Salazar's treating physician, Dr. Bennett, had found all diffuse tender points to be positive and diagnosed fibromyalgia. (*Id.* at 509.) However, the ALJ noted that her fibromyalgia improved in the following months and her symptoms were moderate. On November 29, 2007, Salazar reported improvement in symptoms after using prescribed medication. (*Id.* at 583.) During a follow-up visit on April 29, 2008, Dr. Bennett noted that although Salazar complained of numbness in her legs and arms, an EMG study was unremarkable. (*Id.* at 785.) Later clinical notes document "moderate fibromyalgia" and besides occasional flare-ups she "had been doing well." (*Id.* at 897, 900.) There was substantial evidence in the record to find that although Salazar's fibromyalgia was a severe impairment, the symptoms were moderate and improving such that they would not preclude basic work activity.

Salazar also argues that the ALJ erred in finding that she had not complied with treatment options for fibromyalgia. The ALJ noted that in March 2009, Salazar was advised to maintain a regimen of regular exercise, stress reduction, and aquatic physical therapy as well as to manage her sleep and mood disorders in order to control her fibromyalgia symptoms. (*Id.* at 31, 893.) However, she did not return to physical therapy until May 4, 2009. (*Id.* at 847.) The ALJ further noted there are no records that establish Salazar continued physical therapy after that date, pursued stress reduction techniques, or engaged in regular exercise. (*Id.* at 31.) The ALJ found that "there is insufficient reliable objective evidence that she has fully complied with her treatment options." (*Id.* at 31.) Salazar contends that "there is no specific treatment for fibromyalgia" but does not cite to evidence to support that statement. (Doc. 20 at 8.) The ALJ's findings that Salazar's moderate symptoms from fibromyalgia did not preclude basic work activity and that she did not comply with her therapy are supported by substantial evidence in the record. *See Andrews v. Shalala*, 53 F.3d 1035, 1041 (9th Cir. 1995) ("When the evidence before the ALJ is subject to more than one rational interpretation, the Court must defer to the ALJ's

conclusion."). Thus, the ALJ did not err in interpreting the medical evidence in the record.

### C. Implicit Rejection of Salazar's Credibility

Salazar asserts that the ALJ did not discuss her subjective complaints of pain nor her credibility related to those complaints. Therefore, the ALJ erred by implicitly rejecting her credibility. The ALJ must engage in a two-step analysis in determining whether a claimant's testimony regarding her subjective pain or symptoms is credible. *Lingenfelter v. Astrue*, 504 F.3d 1028, 1035–36 (9th Cir. 2007). The ALJ must first "determine whether the claimant has presented objective medical evidence of an underlying impairment which could reasonably be expected to produce the pain or other symptoms alleged." *Id.* at 1036. If she has, and the ALJ has found no evidence of malingering, then the ALJ may reject the claimant's testimony "only by offering specific, clear and convincing reasons for doing so." *Id.* If an ALJ finds that a claimant's testimony relating to the intensity of her pain and other limitations is unreliable, the ALJ must make a credibility determination citing the reasons why the testimony is unpersuasive. *See Bunnell v. Sullivan,* 947 F.2d 341 (9th Cir. 1991). The ALJ must specifically identify what testimony is credible and what testimony undermines the claimant's complaints. *See Morgan v. Comm'r of Soc. Sec. Admin.*, 169 F.3d 595, 599 (9th Cir. 1999)

Here, at the first step, the ALJ found that Salazar's medically determinable impairments could reasonably be expected to cause the alleged symptoms. (R. at 32.) However, at the second step, the ALJ found that Salazar's "statements are not fully credible concerning the severity and extent of her limitations" and that "[n]either the severity nor the extent is supported by the medical evidence of record." (*Id.*) Since the ALJ did not find any evidence of malingering, his reasons for rejecting Salazar's subjective complaints must be specific, clear and convincing. *Lingenfelter*, 504 F.3d at

- 12 -

1036. The Commissioner contends that the ALJ discussed Salazar's complaints but found that they were not entirely credible.

During the hearing, Salazar complained about pain in her lower back and knees from standing for extended periods of time, pain from lifting her right shoulder, daily headaches, and mild depression. (R. at 104, 106-07.) She testified that she could not sustain full-time employment because of these "pain issues." (*Id.* at 107.) The ALJ found Salazar somewhat credible to the extent she alleged "some bilateral shoulder and fibromyalgia pain associated with her impairments." (*Id.* at 33.) He adjusted the RFC to accommodate Salazar's limitations and pain symptoms, finding that she could still sustain basic work activity. (*Id.*) While discussing Salazar's various impairments, the ALJ implicitly noted medical records that were inconsistent with Salazar's complaints. *See Molina v. Astrue*, 674 F.3d 1104, 1113 (9th Cir. 2012) (upholding adverse credibility determination when there are inconsistencies with other medical evidence including physicians' notes and diagnostic findings); 20 C.F.R. § 404.1529 (the ALJ will consider the extent to which the claimant's symptoms can reasonably be accepted as consistent with the objective medical evidence). Regarding Salazar's back pain, the ALJ pointed to evidence that on January 8, 2009, Dr. Jenpin Weng found that her cervical range of motion was "pain free and within functional limits." (R. at 28, 1031.) Concerning her knee pain, the ALJ noted that after Salazar's left knee arthroscopy on October 29, 2009, there were no records of further clinical visits during the two months before the hearing, "suggesting that [her] left knee problem was either resolved or significantly improved as a result of surgery." (*Id.* at 29.)

Some of Salazar's pain symptoms were controlled through medication. *See* 20 C.F.R. 404.1529(c)(3)(iv) (the ALJ will consider the effectiveness of medication in relieving pain when evaluating intensity and persistence of symptoms); *Molina v. Astrue*, 674 F.3d 1104, 1113 (9th Cir. 2012) (holding that an adverse credibility determination

- 13 -

against claimant was reasonably supported by physicians' conclusions that condition was controllable by medication). The ALJ cited progress notes by Salazar's neurologist, Dr. Gilbert Toffol, in finding that Salazar's headache impairment was stable and that prescription Topamax effectively controlled the pain symptoms. (R. at 31, 843.) Salazar's back pain was similarly reduced with a series of steroid injections administered by Dr. David Herbert. (*Id.* at 939.) Her fibromyalgia symptoms also improved after a regimen of prescription Lyrica and she was "feeling better" as a result. (*Id.* at 583.)

The ALJ considered Salazar's complaints of anxiety and depression but found that they did not limit her daily activities, social interactions, or cognitive functioning to the extent that they would be disabling. (R. at 32); *Molina*, 674 F.3d at 1113 ("The ALJ may discredit a claimant's testimony when the claimant reports participation in everyday activities indicating capacities that are transferable to a work setting.") (internal citations omitted). The ALJ noted that she was able to do light housework, prepare simple meals, tend to her personal needs, get along with authority figures, visit friends and relatives, follow written instructions very well, and handle a savings account and bank book. (*Id.* at 32, 288.)

Lastly, the ALJ found that Salazar's failure to comply with therapy and to pursue treatment reduced her credibility. *Id.* ("In evaluating the claimant's testimony, the ALJ [may consider] . . . . unexplained or inadequately explained failure to seek treatment or to follow a prescribed course of treatment.") (internal quotation and citation omitted). The record reveals that Salazar did not fully comply with recommended therapy for her impairments. On May 2, 2006, it was noted that that Salazar did not go to therapy for her impairments and "is encouraged to work with the therapy and see if things improve enough for her to return to work in June." (R. at 507.) During a visit on October 14, 2009, Dr. Craig Weinstein noted that Salazar had a worsening of knee pain but she had stopped going to prescribed physical therapy. (*Id.* at 1038.) Although Salazar complained of

depression and anxiety, the ALJ noted that "there is no evidence she has ever sought any formal mental health treatment [or] participated in any in-patient counseling." (*Id.* at 32.)

The ALJ did not implicitly reject Salazar's credibility without addressing it. He provided specific, clear and convincing reasons when discounting Salazar's credibility relating to her pain complaints during the hearing. Further, the ALJ considered the complaints he found credible when determining the appropriate RFC and limitations on her ability to work.

## CONCLUSION

The ALJ made no error of law and there is substantial evidence to support the ALJ's denial of benefits.

**IT IS THEREFORE ORDERED** that the ALJ's decision is **AFFIRMED**. The Clerk of Court is directed to terminate this case and enter judgment accordingly.

Dated this 20th day of June, 2013.

_____
G. Murray Snow
United States District Judge